Lucas when you're in. May it please the court I'm Luke Largesse I'm here on behalf of the estate of Danqueers Franklin his mother Deborah Franklin. The court below found that it was nearly beyond doubt that when defendant Curls shot Danqueers Franklin he was complying with her order that he take put the gun down. He was taking the gun out of his clothing and putting it down. But it found that that mistake was reasonable. We appeal from that finding. We think that a jury in this case on this record could find that there was no immediate threat that the unreasonable and unreasonable. And that the shifting explanations for the shooting by Officer Curl and Officer Deal a jury could find that they knew the shooting was not justified. Their response to this appeal shows the need for a jury trial. They say it defies logic to say that she was attempting to comply. That he was ignoring the officer's proper commands. That he deliberately hid his hands. That he acted in a menacing way by not responding to them and therefore their actions were reasonable. And in particular they say that the shooting was justified because Ms. Curl perceived that Franklin took the gun and began to turn toward her with it. So she perceived the threat and killed him. Well we can look at the video and see what happened. We can and Judge Mullen did not address the difference between what happened and what she described which is one of the issues in this case. So how do you get to the city on this case? I think under the Starbuck decision. Well the Starbuck is different because in Starbuck that's the school board case. In Starbuck the school board and under Virginia law the school board makes the ultimate decision about whether to suspend a child. So yes it gets recommended up through various levels and preliminary decisions are made. But the ultimate decision whether to suspend is made by the school board. They were in essence the acting entity. Here in contrast the city government simply reviewed the action and did not fire the lady, the officer. No it's different than that Judge Gibbons. In this case you had an ordinance that established the city manager as the final policy maker for a use of force. We went through the citizen reviewer process that they recommended unanimously that the shooting was not justified and he refused that decision. That under Propotnick is ratification of the decision. And that Marion v. Hall versus Marion School District was in this case another school board matter. But the issue is whether there's a final decision maker under state law. And the ordinance established the city manager as the final decision maker. But he didn't make the decision to shoot the victim. But Propotnick is about ratification. It's not about making the decision and the is that there is no causation requirement under Propotnick. It's not a moving force requirement, which has been kind of this confusion in the law. In Starbuck the school board did cause the harm. They ratified the action of the board in discriminating against the student for the speech. They were the board. I mean of the superintendent, of the school administrators, of disciplining the student or limiting the student's participation. They were ratified that lower decision. And that's what Propotnick is about, ratification. But let me come back to these three things that they rely on here primarily. Well, do you think the city had a policy of shooting people who were acting innocently? Of course not. No. But under Pembauer you can have sort of the sequence of events here is Manal says there has to be a policy. Pembauer says it can be a single decision. It can establish policy. And Pembauer, that's the case where they searched the doctor's office, right? And in Pembauer there was an assistant district attorney who made the decision and told the police officers to go search the place. She was the moving entity in that case. And then there was language in the case about whether you can delegate final policymaking authority, which led to Propotnick. But that's what led to Propotnick, Your Honor. And Propotnick sort of goes beyond. It's about when does ratification make a municipality liable? And here the city manager said that this shooting complied with city policy. Not that city policy advocates what happened, but that this complied with it. Counsel, I have some of the same concerns that Judge Gibney has. I don't, to me, I don't understand the basis for the municipal liability because the municipality in this case has actually set up three different levels to review these shootings. They weren't interested in just dismissing it. They weren't interested in leaving it all up to the police. So you have a police department reviewing, and then you have a shooting review board looking at that, and then you have a citizen's review board looking at that, and then you have a city manager. And the municipality should be given some credit for considering these cases carefully through this series of staged review. And I'm afraid that if we say all the city manager decided to do is not to prosecute for a completed act, that that somehow makes the municipality the moving force. And in addition, counsel, there's some other facts here that I'd like you to address. This individual was removed from patrol, and as I understand, he was given a desk job as a detective. And also, the individual police officer was ordered to go through retraining. So there wasn't a situation in which the municipality just looked the other way. They removed the officer from patrol, and they ordered retraining. And when you look at the Supreme Court decisions and the emphasis of the Brown decision that there at least has to be some moving force on the part of the municipality, I don't understand it there because it seems to me that to the degree that the officer acted, she violated the policy of the municipality. Good police work would have you raise your hands and not, say, drop the weapon, which requires the suspect to reach for a weapon. But I don't understand why or how this municipality could be called on the carpet given the way their structure has been set up and given the fact that they did take disciplinary action. Let me try to address your concern, Your Honor. It is the very fact that the structure is there that creates the legal liability under Brown. If a final policymaker looks at and approves of the decision of a subordinate and the reasons for it, then the municipality is liable. It's a very simple proposition. It's essentially just condemnation or ratification liability, which is understood in the law in lots of places. Brown has nothing to do with condemnation or ratification. And that's the confusion here. You have to go back and re-project. And the city, they reviewed all this, but, Your Honor, at every stage, internal affairs, the shooting review board, the city manager, the chief of police all said that she acted consistent with policy, all of them, which is the absurdity of this case because they clearly are finding that she was involved in this situation entirely and caused this death as a result of her unreasonable mistake. But they said it followed policy. And that makes the city liable under Brown. Well, if it followed policy, then why was she removed from patrol? And why was she required to undergo retraining? If somebody's followed policy, you don't have them retrained and you don't have them removed from patrol. And I want to make that argument in a jury trial, Your Honor, because if you look at the record, the shooting review board calls her back in and says, we find no policy violations. We find no training violations. But you have to be retrained. It's an absurdity in this record. And to sort of say that somehow the city should get credit for the way it handled this situation, the you just said a moment ago. She gave the wrong commands. She shot the man for doing what she told him to do. That's fine, but that was not good police work. And if they thought it was good police work, they wouldn't have removed her and had her retrained. In other words, you do. But understand, Judge Wilkinson, understand that the way that you get to the citizen review board is by the chief sending a letter to Mrs. Franklin that they found no policy violations and that the shooting was justified. That was the official position of the police department that let her go under the ordinance to have it reviewed by a citizens panel, which then said it was unjustified. Asked the chief to change his decision. He refused. And the city manager agreed in deposition with every finding of fact of the citizen review board except declared the shooting was justified. The absurdity that you point out is not limited to this case. This is what happens in police shootings all the time. One of the favorite tactics is to appoint a Commonwealth's attorney from a different jurisdiction to review it. And they come back and say, well, there's no violation of the law. It's a municipal practice that needs to end. But that sort of begs the question of whether burying it makes it their policy. But the policy issue is under the city 25 years ago established a citizen review board. And this was the first time the citizen review board had found a citizen for 25 years. Didn't the district judge also say that there could be no municipal liability because the officer was not liable? That's an underlying argument. But I think that's the question I was trying to get to at the beginning as to why the officer was liable. She tries to argue here that he made this move. But the video shows he didn't. The autopsy shows he didn't. And she said she didn't. At the shooting review board six months after the shooting, she tells the police department that there was no movement. She shot him as soon as she saw the gun. Because this was an active shooter situation. This was Ubaldi or Columbine. She had to take out the threat. And the board said, oh, that's ridiculous. And sent her for retraining on how to take cover and give commands. But then announced Judge Wilkinson that she violated no policy or training. And that's an internal discussion, not one for public like the Commonwealth attorney. But under that structure, there is a final policymaker who affirmed the action of the employee. And that creates liability. I want to just address a couple other things about the way this record is treated by the defense. There's a difference between ratifying something and deciding not to prosecute something. You can decide not to prosecute something. That doesn't mean that you ratified what was done or that you moved to do that the city was in some ways a All they decided was not to prosecute. But what they did do, as I mentioned earlier, was they removed her from patrol, which they should have. And then they gave her a detective job, which they should have. And they required that she go for retraining. And then the city manager says, well, I'm not going to prosecute. But that doesn't seem to me to make the municipality culpable when one considers the totality of the situation here. But that's not the legal standard, Your Honor. Yes, well, the legal standard is in Brown, which you have forewarned. No, it isn't. I'm sorry, I was quoting from a Supreme Court opinion. Prodnick is the Supreme Court opinion that establishes ratification liability. Brown has nothing to do with that. Judge Gibney points out this is a little different from Prodnick. But I think what he was pointing, if you look at Starbuck, it reviews your decision in Hall v. Marion. It reviews the logic of Prodnick. And it's not that the municipality is the moving force in the violation, but that it has condoned it. That's the basis for liability. And there's no qualified immunity to the municipal liability of the city. And my time is up, so I'll yield to Ms. Keeton. Thank you, Mr. Long. Ms. Keeton. Good morning, Your Honors. May it please the Court. I'm Lori Keeton. I'm here on behalf of Officer Wendy Curl. Summary judgment was properly granted in this case by Judge Graham Mullen because Officer Curl reasonably believed that Decurious Franklin posed an imminent threat of serious harm. Did you look at the video? I did, Your Honor, several times. How can you make that conclusion? Because, Your Honor, we have a gentleman, if I may, who is... What we have to look at here, Your Honor, is what did Wendy Curl know when she approached this scene? What she knew is we had a gentleman at a crowded Burger King restaurant in the 9 o'clock hour. He had a gun. She knows all this through the CAD report, so these are things that she knew. I'm sticking to only things that Wendy Curl knew, Your Honor. She knew that not only he had a gun, because we all know that possessing a weapon in and of itself would not justify a use of deadly force. He didn't just have a gun, Your Honor. He was pointing that gun, and he was going in and out. Well, not at the time of the shooting, he wasn't. No, Your Honor, but we're not limited. We have to consider... Did the officer panic and shot the guy after he had been calmed down? No, Your Honor, I think that's incorrect. When she arrives on the scene, they know that he's had a gun, that he's been brandishing that gun. They then see him with his hands clasped between his legs as he's squatting within inches of a man who we later found out to be Mr. Greer. Of course, at that time, Officer Curl has no idea... I understand the report to say that the individual was brandishing the gun. Correct, Your Honor. That is what the 911 call said, that he had been pointing and brandishing the gun. And then we have two 911 calls here. We have two 911 calls describing his appearance, that he was brandishing a gun, that he had gone to the Burger King to fight. And then we have him traveling both in and out of the restaurant. And then when they arrive, they see him crouched down on the balls of his feet within inches of Mr. Greer. For all they know, Mr. Greer could have been the gentleman that he went to the Burger King to fight with. Let me ask you this. Yes, Your Honor. One of the things that concerned me about this case was that Officer Deal, who was with Officer Curl, testified in this case that he was surprised at the way that Officer Curl was operating and that she was crossing in front of him and that she was the individual that Officer Curl gave the wrong command and the wrong instructions. I mean, isn't it a very dangerous thing to say that you should drop your weapon which forces the suspect to get the weapon? Your Honor, I think the question here is was the mistake she made in believing the gun was between his legs reasonable because everything stems from that. They know he's had a gun and that he's been threatening with the gun. They show up, his hands are between his legs. They believe there's a gun there. And as Judge Mullen found, it was reasonable to believe that is where the gun was. And I will remind everyone, they began with the command, as you all mentioned, of show us your hands. That was stated four times. They then did not give any... But they also commanded him to drop his gun, right? Perhaps he was supposed to drop his gun without putting it in his hand. Well, Your Honor, I think... To stand up and shake it out of his pants or what? And again, Your Honor, I think the question here is this. Was it reasonable of her to assume that the gun was between his hands as both she and Officer Deal... Which way was the gun pointing? I'm sorry? Which way was the gun pointing? Well, I don't think at that point the gun was pointed anywhere. It was between his legs. Well, when she finally saw the gun, which was the motivating factor for her shot, which way was the gun pointing? I don't think the motivating factor for her shot was... Well, which way was the gun pointing? The gun was pointing towards him. So it was not pointing towards Mr. Greer. It was not pointing towards the officers.  Which can be done in a matter of seconds, as any police officer would tell you, Your Honor. And as far as the crossing and the commands and the cover go, this type of, well, she could have done better, she could have responded differently, is exactly the type of judicial hindsight that's prohibited by this court. I would point the court to Anderson v. Russell, Elliott v. Levitt, Greenidge v. Ruffin. In all of those cases, we have exactly... When they arrived at the scene, there was no resistance on the part of this suspect. There was no attempt to flee, at least as far as I could read the record. And wouldn't you have expected a more active sort of resistance? But as I... Am I wrong to read the record in saying that the suspect here was passive? I think that things had de-escalated some from where they were before they arrived. However, they still had an armed man with an interest of a patron, had no idea, as Mr. Greer said, of what he was going to do with the gun. And so the threat was still there. And so she couldn't just say, oh, he's fine, he has a gun, no worries. It wasn't just possession of a gun, like the cases that plaintiff cites, the Cooper case and all of those, where someone's in their home with a weapon and they walk out thinking there's a disturbance. This is a very different situation. We're in a crowded restaurant and a man has a gun and he's already shown that he's willing to use that gun. So it was reasonable to believe his response made her believe he wasn't complying with their commands. He did not give any indication. He didn't make eye contact. He would occasionally gaze around. He was non-responsive. So it gave the reasonable impression that Mr. Franklin was not complying with the officer's commands. And so given the fact that we've got... Which specific commands? Well, there were four commands to show your hands, which he ignored. There were then 22 commands, I believe, variations of drop the gun. And so because they assumed the gun was in his hands, which was reasonable as they were clasped, and I'm not suggesting that he intentionally in some nefarious manner was hiding his hands on purpose, but you have to look at this from the viewpoint of Officer Curl at the moment it occurred. From her standpoint, they believe reasonably that that gun is right between his legs. He could easily pick that gun up in a moment. And we have cases in this jurisdiction, many that say you don't even have to have a gun for the force to have been appropriate. The gun doesn't have to be pointed at you for the force to be appropriate. So this case is no different than those cases. I understand that we look back now and the temptation is so great to say, golly, if you had just stuck to drop your hands, this might have turned out differently. But that is exactly what this circuit has repeatedly told us not to do in these situations. That's what qualified immunity is all about. Again, what about Officer Deal, who was on the scene and he said he was shocked by the decision to shoot? Well, I think what Deal said, and I think we have to remember, as many of the cases such as Sigmund v. Chapel Hill and other cases tell us, his vantage point was different than Officer Curl's. The whole reason Officer Curl ends up crossing and not having the cover that you would like her to have is because she needed to be able to be a good officer and see Mr. Franklin, see his hands, and see Mr. Greer. So that's why she moves. Deal was at a vantage point behind where he could not, and he admitted this, from where he was standing, he could not see Franklin's hands. He could only see a part of him. And so I think to take what Deal said, I don't think Deal stands for the, quote, reasonable officer here. He wasn't experiencing the same thing that Officer Curl was because he was in a different spot. It's also important to note that Officer Deal ultimately said that he believed that Dracarys Franklin represented an imminent threat and that he had regrets that he had not acted sooner and that he felt guilty about that. And so I think it's important to note that. And so what happens here is that she has the reasonable belief the gun is between his legs. They keep giving these commands. They're in their uniforms. They're in their police cars. The commands are loud and clear. So this isn't a situation like some of the other cases where there's a doubt if he knew they were the police. We then have bystanders come out, which only heightens the risk here because now we've got more people in the mix. And so all this is happening. And so Officer Curl is having to make these split-second judgments about what to do. And I want to talk just briefly about what happened after because you guys spent, I'm sorry, Your Honor, spent a good bit of time on what happened after the shooting. And we talked about, oh, well, she was removed from control and that she got more training and that these sorts of things. And plaintiff makes a lot of discussion about the fact that the shooting review board asked her hard questions. But I think it's important to note that there's nothing before you all in the record to suggest that she was removed from control as some sort of punishment. She was never asked in this record anywhere why she was removed from patrol. She went back to a prior job as a detective that she had held for nine years. As far as the training goes, the appendix before you all makes it clear. The training was ordered by Chief Putney. I'm sorry, by Chief Jennings, who's now chief. Then he was deputy chief. Jennings made it clear that the training was ordered not because he felt that Wendy Curl had done something wrong, but because he felt that it was a traumatic situation and that you needed to be sure you were comfortable going back into the field if that's what she decided to do. So there was no ratification. Is that your point? They thought she was doing just everything fine. So I'm going to let Mr. McCallum answer more on the ratification since he represents the city, but I would say, Your Honor, that I believe the city properly and appropriately found that Officer Curl's actions were appropriate given the scenario that she faced, given the fact that we're dealing with someone with a weapon that appears to have the hands hidden, the guns there. It appears to be a furtive movement, and it was reasonable for her to assume that. Is there a training claim against the city in this case? There's a negligent hiring, supervision, and retention, I believe, Your Honor. Yes, Your Honor. So, Your Honor, and I would just briefly like, I know that my time is running out, but to address some of Plaintiff's cases. Plaintiff points the court to Cooper v. Sheehan, Hensley v. Price, Nibbs v. Montford, Stanton v. Elliott, and it's important to look at these cases because I think they illustrate why summary judgment was proper in this case because you have to look at the difference between the cases. In Cooper v. Sheehan, we're dealing with a residence where there's a domestic disturbance. It's at someone's house. They fire without warning. He even calls out to see who's in his yard, and they do not answer. So there was no announcement there, and it's in someone's home. Hensley v. Price, it's in the daytime, and I made an error in our brief, and Plaintiff pointed it out and said that the police, he didn't realize it was the police, he did. But in the Hensley case, there's no communication whatsoever. He comes with the gun in plain view by his side, so there's no question of it being hidden, and there's no presence, no commands given. So these cases, all the commonality in the cases that Plaintiff puts before this court are that they involve situations of someone being in their home, and then they come out with the weapon because they believe there's a disturbance on their property. Or like in the case of Nibbs, the man is in his home when he is shot, and that is he's in the home about to investigate a noise that he hears, and he is shot. So, Your Honor, respectfully, I would say that those cases are very different than the cases that apply here. But each of those cases involves the determination whether there was a threat that required a shooting, right? I'm sorry, Your Honor? Each of those cases involves the determination whether there was a threat that required a shooting, which is exactly what we have here. That's right, but our cases, Your Honor, also other cases would fall under like Slattery v. Rizzo, Greenidge v. Ruffin, Gooden v. Howard, Milstead v. Keever, and Elliott v. Leavitt. Your Honor, those cases are more on point here because those are cases that occurred and there was a mistake made. Just like you all are saying that Wendy Curl made a mistake here, in every one of those cases, it is suggested that the officer at issue made a mistake, and sometimes they were pretty big mistakes. They go to pick someone up for the psych ward, and they get the wrong person. They go to address the bad guy, and they shoot the good guy thinking he's the bad guy. Let me ask you this. Obviously, this is an issue which is, these shootings are an issue that has drawn a great deal of community and national attention, and for good reason. But I'm wondering if there isn't some therapeutic value or some community value to having a case like this, which is a close case, and there are some disputed facts, to having it go before a jury, and having a jury of one's peers look at this and render a judgment. Isn't there some value in a case like this where the issue is as volatile as it is to send the signal that the judicial system takes these cases seriously, and the jury is the best way to send that signal? What do you think about that? That's something I've been reflecting on. And I think we have competing policy concerns here, but I also think what's important here is I do think there are cases that need to go to a jury, and you send those. This circuit sends those cases to a jury. And so, like in Nibbs, which was recently before the Fourth Circuit, that was a case where the officer's mistakes were not reasonable, necessarily, and so you all sent that back for a jury to decide. That happens frequently. But the other competing concern here, and the concern that's implicated by the Curl case, is the doctrine of qualified immunity, and the fact that, yes, we need to answer for when police officers make unreasonable mistakes. However, we also need to give latitude when police officers make reasonable mistakes, because if we don't, they're going to be unable to do their jobs. If we're going to sit here and second-guess everything they do in the benefit of this beautiful courtroom, way after the fact, that's going to be a problem for our officers, because they're not going to feel like they can ever safely use force when presented with a situation that requires it. So, so long as the mistakes were reasonable, then this is a case where qualified immunity should apply, just as Judge Mullen found. Well, we look at the facts through the eyes of the officer, but we still view the evidence in the light most favorable to the plaintiff. So there's a tension there. Absolutely. Between the two of them. And that's why I think your esteemed opponent here is saying, this ought to be presented to a jury, because people can look at it differently. They can, Your Honor. I think, fortunately, we have case law in our jurisdiction that helps us and educates us on how this should come out. And what I mean by that is, I agree that this case should be looked at through the body-worn camera and through the facts most favorable to the plaintiff. That is the appropriate standard, and we do not dispute that. However, I think when you look at the case through that lens and you apply the case law in this jurisdiction, what we find is an officer who made a tragic but reasonable mistake, and we have to look at it through... And the mistake was a mistake of fact. Is that right? No, I think it's like many mistakes in these cases. It's like looking and thinking someone has a gun when, in fact, they have a beer bottle. It is looking and thinking that someone is reaching for a weapon and they're reaching for a Walkman. Those were determinations this court made were reasonable errors and determined the officer was entitled to qualified immunity. This is no different. I'm asking this court to realize that Wendy Curl's belief that Mr. Franklin had his gun between his legs, clasped in his hands, coupled with all the other things going on, what the 911 caller said, the fact that there were other people around or in a public place, that it was reasonable to assume he wasn't complying with commands given the fact that he was not interacting with them, that he was gazing around, all of those factors should be taken into account to say that she's entitled to qualified immunity in this case, Your Honor. And also, the reality is, given where she thought the gun was, when he went to get the gun out of his pocket, it appeared to be a furtive movement. So I do think this is a conclusion that this court can reach and has reached in numerous other cases before, Your Honors. And just, I know I only have 40 seconds, but I would also mention the state law claims were properly dismissed here. No, no, no. Those seconds are increasing. Oh! Oh, I've got all kinds of time. No, I'm just kidding. So the state law claim was properly dismissed because they were objectively reasonable. So for the same reasons that the federal claims were proper, the state claims were properly dismissed. And so I think it's important to consider that as well. And I would also want to address the Citizen's Review Board. I do not think that these issues... Counselor, did you understand that your time is up? Okay. Oh, it is up. I'm sorry. Thank you. Thank you. Is this my final? No, no, no, no. I apologize, Your Honor. No, that's okay. I know sometimes, that's why I was telling you, the seconds are going up. That's how much time over you are. Good morning, Your Honors. May it please the Court. I'm Roger McKelvin on behalf of the City of Charlotte. As indicated by Ms. Keeton, I'm here to discuss the issues of ratification as raised by the plaintiff in this matter. And in this case, one underlying issue that has been overlooked is all of the underlying cases that plaintiff cites, too. There's a common theme. That common theme is that the final policymaker invokes the harm. That common theme is that the final policymaker has the ability to stop and undo the harm, place the person or student back in the position they were before the harm occurred. When we look at Propotnick, that was an employment law case. Mr. Propotnick had previously filed a grievance with the commission, and the commission agreed, and they undid his 15-day suspension, they gave him back pay, and they just gave him a written reprimand. So at that point, the commission was able to place him back as before the injury occurred. When they finally terminated Mr. Propotnick, and it was deemed to be in retaliation, it was not until he had no further appeal left that that termination was final. Therefore, the commission ratified the retaliatory purpose and used that purpose to terminate Mr. Propotnick. Did the commission make the decision to terminate Propotnick? At the end, yes, Your Honor. When we look at a case heard by this court, Starbuck. In Starbuck, footnote number five, this court tells us that the school board had the ability to undo the suspension from the student's permanent record. That case was a case about the First Amendment and a violation of his First Amendment rights. The student gave some speech in school that the school did not like. The student was suspended at the school level. He appealed to the board, the last final policymaker. The final policymaker knew of the First Amendment violation. They had the ability to undo it. They chose not to, and that is when liability occurred to the school board and to the municipality. In the matter before this court, no such power is granted to the city manager. For such a power to exist, it would need something of the city manager's able to place Mr. Franklin back in the position prior to the incident occurring on March 25, 2019. When we look at the cases, the common theme is there. We do not have that here. We do not have the ability to place Mr. Franklin back where he was. There was no affirmative action prior to the discharge of the weapon by Officer Curl that led to the shooting. When we look at Panbar, that case, before the officers broke down the door with the ax, they stopped and they called. A final policymaker was the one who reviewed those actions. He said, yes, break down the door to serve those subpoenas. Therefore, he was directly liable. He was the moving force in this matter. Our city manager in this case is not the moving force. Liability should not attach to the city. And as to the negligent training claim, plaintiff, per her complaint, she based the negligent training claim on a theory of ratification which we are arguing does not apply in this matter. That is my time, unless you have questions. Thank you. Thank you, Mr. McCoy. Let me make just three observations in exchange for a rebuttal, if I may. Counselor, could I ask, because you did not have a chance, we didn't give you a chance to develop the case on the merits of the excessive force claim apart from municipal liability. Your opposing counsel has made some comments, and he said we shouldn't hindsight this situation, that this was a last split second kind of decision. What do you say about that? That's actually what I was going to address, Your Honor. The first thing is that all of the mistake cases that she cited and that Judge Mullin cited below are the inverse of this case. All of them are where the officer gave a proper command, most of them to raise your hands. Where the person, after the officer leaves cover to approach the person, the person then stopped following the command or never followed it in the first place. In slattery, they open the door. But wasn't that command given here? Show your hands. Show your hands was given before they could even see him. The only command, you look at the video, the only command given to him after she crossed and has contact, that's when the seizure begins. They have the guns drawn on him and they are in contact with him and they tell him, drop the gun. That's the only command they give. And the chief said the only way he can comply with that is to take it out of his clothes. The only way. So it's the opposite of these cases. It's a totally improper command that he's following, not a proper command that he's disregarding. I thought a command was given to show us your hands. When they first get at the scene and get out of the car, they yell that, but they're on the other side of the car. They can't even see him yet. And they're not coming in with sirens. He doesn't, there's no, because he's dead, there's no record as to whether he even understood who was yelling at him. The only command given for the 32 seconds that he's in the body camera video with him leaning close to Mr. Greer, who says that he slowly took the gun out and immediately pushed out. All right, so what do you say the officer should have done? Well, if their concern is that we can't see his hands, you say, show me your hands. Everyone in the police department, this isn't judicial hindsight, Your Honor, everyone in the police department, Mr. Deal, the investigators, then two days later, the shooting review board, the chief, a week after this shooting, the chief in a community meeting about the shooting explained how this is supposed to be handled. It's like a felony stop. You get the person back away with their hands up, and you either get them on the ground or put their hands behind so you can take them into custody. This was a routine matter that was calm that they mishandled, and that's the basis for the liability. Counsel, are you saying that under these circumstances that they should have approached him? No. What are you saying? No, the felony stop is you get the person to come to you with his hands up. Felony stop. And this is what the chief Putney said. What had they been told that he had done? They had been told that he had a handgun at the... Doing what with it? Threatening and trying to fight with someone. Threatening, trying to fight. When they got there, what was he doing? He was squatted down like a baseball catcher having a calm conversation with the gentleman in the car. And the gun's nowhere to be seen. And they make commands, and you're saying they should have said, put your hands up. Everyone in the police department says that, Your Honor. Why didn't you give that command? Why didn't you give that command? Why not? That is the trained command. Show us your hands. We think you have a gun. Show us your hands and keep your hands out so we can take you into custody. Which hand moved first, left or right? She thought it was... I've seen the videos several times. No, I'm asking you. Which one moved first, left or right? I don't remember, Your Honor. You should know, because you're saying the police officer did something wrong. We know it was his right hand and he came up, right? Right. But which hand moved first? I don't know, but if I can say this... Didn't he move his left first, like this, and then he came up like that? He came up a little bit. His left hand moved first, correct? Which is... No, wait a minute. Did his left hand move first? I don't know, Your Honor. I'd have to look at the video. I've never thought... Wait a minute. Wait a minute, counsel. You're telling me that you have to look at a video. I assume you've looked at a video 20 times. At least. And I've never focused on that question. Well, I looked at it, and you go back and look at it. The left hand moved first, didn't it? Well, go with this so you don't know. So I guess I can't question you because you... What Ms. Deal said, Your Honor, was that... I'm not going by what Ms. Deal said. I'm going by what I saw. And he was crouched over here with his legs seeming to be apart and squatting, and they asked him several questions. Didn't he turn to them without turning his body and say, I hurt you the first time? Right. Didn't he say that? Yes. So we know he hurt them. Yes. And we know he understood them. Yes. And what he did was he moved and he lifted up. He lifted his hand up like this. Right. And you're saying there was no danger to the police officer? They could see it was empty. When he went to reach, you could see that he had not had the gun in his hands. I'm not saying that there's no danger, Your Honor. I'm saying that the danger here comes, her perceived danger comes from her incompetent handling of the situation. She's supposed to, everyone in the police department says she's supposed to get him to get his hands up and back him away from Mr. Greer. But the point is, really, the procedures of the Charlotte Police, wherever this was, the procedures of the police department don't define what the Constitution requires. The Constitution requires, and it has to be a reasonable action by the officer. That's really the question. And that's the question you think ought to go to the jury, right? Yes, but they interact here. And this is because the reasonableness of the seizure is her conduct during the seizure. Okay, but it's not judged by municipal policy except for municipal liability. But as for Officer Curl, you look at what she did, did what she do is reasonable, and you reach the conclusion that she didn't because she did not reasonably perceive a threat. And that's what you think ought to go to the jury. And you think that a reasonable officer, it's really not what Curl thought, it's what a reasonable officer did. A reasonable officer. And the other officer at the scene did not shoot as he was moving. Well, but the other officer is not the jury or the judge in this case. But it's a question of the reasonableness of the officer. You have to look at how they're trained. The reasonable officer is the trained officer handling that situation. But if it's that close, doesn't qualified immunity kick in? No, because in those cases, Judge, it's where a proper command was given and not followed and a threatening move was made. Here, an improper command is given and he slowly complies. Is it not close when you have a report in a fast food restaurant that somebody is brandishing a gun and when someone doesn't display hands in response to a command and when you surmise accurately that the individual is armed and when the individual looks like they're making a motion to draw a weapon? That's a close case. And the question is, in a close case, does qualified immunity kick in? It is a close case. But the question is, does that go to a jury automatically or does it go under the rubric of qualified immunity's reasonable mistake? Well, there's two issues here, Judge. One is that everyone in the police department thought Harkonnock was unreasonable. It's not judicial hindsight. It's police department hindsight. And number two, under Perprotnick, qualified immunity doesn't apply. And this is a case against the municipality because they ratified what happened. And I think if you're going to find otherwise, you're going to be at odds with Hall, Brink-Marion and with Starbuck and we're going to have to have an ombudsman. Well, there are two cases here, one against the city, one against the officer. And with respect to the officer, isn't the question that the individual was complying with her command to drop the gun and she then shot him? Exactly. But that doesn't deal with municipal liability. The only way, the chief said the only way that he can comply with that order is to take the gun out. The only way. Because she did not handle the encounter properly. It's not what the chief said. It's not what anybody else said. It's what we reasonably perceive. And fortunately for you, you've got a video that shows what happened. And the jury would learn that in the face of that video, they claimed that he took the gun out and put it in a pistol grip and pointed it at her. Okay, she may have lied about it or whatever. Well, it's not just may. That's a critical issue about the reasonableness of her conduct. If they're making up a tale that doesn't fit the video, the jury certainly needs to know why are they doing that, unless they know that the shooting was not reasonable. So they make up what it is. I'm sorry, we're way over. Thank you for your time. All right. Thank you, counsel. Thank you both. Appreciate your arguments. We can't come down and greet you as we normally would, but please know that we appreciate your argument in these very difficult cases. Thank you so much. Be safe. Stay well. Thank you.
judges: Roger L. Gregory, J. Harvie Wilkinson III, John A. Gibney Jr.